**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal Action No.: 14-23 (JLL) |
| Plaintiff, | |
| v. | **OPINION** |
| LAMONT VAUGHN, JAREZ BARON, | |
| Defendants. | |

**LINARES**, District Judge.

Currently before this Court is a Motion filed by Defendant Lamont Vaughn requesting that the Court dismiss the indictment because of what he alleges was the Government's failure to preserve certain text messages related to its investigation of Defendants. The Court conducted evidentiary hearings and heard counsel's arguments regarding the missing text messages on September 1, 2015 and September 24, 2015.

Prior to addressing the factual details, the Court notes that the Government has conceded that the issue remaining before the Court "is the remedy" because "[t]he Government is not disputing the fact that it had an obligation to preserve text messages, and that [what it categorizes as] a limited . . . number of text messages were not preserved." Hr'g Tr. (Sept. 24, 2015) at 337:4-8. The Government also acknowledges that suppression of at least certain text messages is appropriate, and has proposed that "the Government be prevented [in their case-in-chief] from being allowed to use text messages between all of law enforcement, FBI and State Police, and the CW." *Id.* at 358:9-19. The Government, however, argues that it should be able to use text messages between the alleged co-conspirators as well as text messages between Defendant Vaughn and the CW. *See id.* at 306:13-16, 358:20-359:6.

Defendant Vaughn, on the other hand, has repeatedly taken issue with the Government's representations to this Court as well as the Defendants and the information allegedly provided to Defendants by the Government.   Defendant Vaughn asserts that the Government has destroyed evidence through the deletion and/or failure to preserve text messages, and has misrepresented facts to him and the Court. He argues that these actions by the Government demonstrate bad faith on the part of the Government warranting dismissal of the indictment.   *See id.* at 334:4-9. Alternatively, Defendant Vaughn requests that this Court "instruct the jury . . . that they are to take it as true that the Government destroyed these text messages deliberately because they, the text messages, help the defendant's defense." *Id.* at 334:9-13.  With respect to the request for a jury instruction, the Government asks that the Court reserve on "any spoliation instruction . . . until the entire case has been [presented] before the jury." *Id.* at 356:14-16.

Thus, the issue for the Court to decide at this juncture is simply the remedy to be imposed. The points of disagreement between the Government and Defendant Vaughn relevant to deciding the appropriate remedy are: (1) the cause of the lost messages—intentional destruction or simple negligence or misunderstanding (including, but not limited to, the appropriate preservation policy against which to judge New Jersey State Police Lieutenant Gregory Demeter's ("Lt. Demeter") actions); and (2) the importance of the lost messages—given Lt. Demeter's role in the investigation, the quantity of the missing messages, the likely substance of the missing messages, and the relevance of the time period of the missing messages.

## BACKGROUND

In August 2012, the New Jersey State Police and then federal authorities began using a cooperating witness ("CW") to investigate Defendants.  Among other things, the CW "conducted approximately thirty (30) controlled [drug] purchases" during the period from August 2012 to

August 2013.  *See* ECF No. 99 (Gov't Opp'n to Defs.' Pretrial Mots.) at 4.  During the relevant time period of the investigation involving the CW, the CW exchanged Short Message Service electronic communications ("text messages") with F.B.I. Agents, as well as Lt. Demeter.

Defendants were indicted in this matter on January 17, 2014.  Defendant Vaughn is proceeding *pro se* in this litigation, while Defendant Baron is represented by counsel.  Defendant Vaughn made his first request for documents from the Government on January 29, 2014.  Several months later, on July 28, 2014 after the Government's production of some documents, Defendant Vaughn made a motion requesting that this Court "order the Government to obtain and turn over to the defense all telephone records relative to the 'lost' telephone that was used by New Jersey State Police Officials to communicate with the confidential informant." (*See* ECF No. 82 at 19-20.)  The present motion related to text messages (*see* ECF No. 122, docketed May 29, 2015) reflects the course of events beginning with the raising of this specific issue in July 2014 by Defendant Vaughn.   In the fifteen months since this issue was first raised to this Court, there has been additional information provided to the Court via letters by the Government and Defendant Vaughn, as well as numerous hearings on the matter (including on February 18, 2015, May 11, 2015, July 20, 2015, and two evidentiary hearings held on September 1, 2015 and September 24, 2015).

## A.    Factual Background Prior to the Evidential Hearings

This is not a case of missing text messages from one or even two phones where the reasons for the missing messages were reasonably and quickly identified and explained.  Here, the issue is related only to Lt. Demeter's text messages, but the story involves four different phones over a three plus year period.  All four phones were used by Lt. Demeter to communicate with the CW.  One (the Casio) was allegedly physically lost in 2013, and then recently found shortly before a

hearing on this matter. One (the Blackberry Bold) was not physically lost, but the data existing on the phone was lost and then subsequently and only partially recently recovered, again, not long before one of the hearings held by this Court on this matter. One (the Samsung flip phone) was only very recently identified after additional documents were produced by Verizon pursuant to a request by Defendant Vaughn and an order of this Court. Lt. Demeter has no specific recollection of the phone, and its physical location remains unknown. And, finally, one (the Samsung Galaxy) is intact and has never been lost or suffered any mishap. However, any text messages contained thereon are subsequent to February 2015. The four different phones of Lt. Demeter at issue and the time periods those phones were activated are identified below:

- June 7, 2012 to December 19, 2013: Casio flip phone

- December 19, 2013 to April 7, 2014: Samsung flip phone

- April 7, 2014 to February 27, 2015: Blackberry Bold

- February 27, 2015 to present: Samsung Galaxy

Because of the confusing nature of the relevant facts as well as Defendant Vaughn's issue with the sequence of events and representations by the Government, the Court presents the factual background[1] in a timeline format and provides more historical detail. This is important due to the nature of the remedy imposed, and because the Court agrees with Defendant Vaughn that the Government's representations and actions in dealing with the text messages at issue and the manner in which the Government dealt with requests from Mr. Vaughn and this Court informs the Court's credibility assessment generally as well as its assessment of the Government's assertion that, at most, there was simple negligence in its failure to preserve the text messages between Lt.

---

[1] With some exceptions, this section does not include information obtained through live testimony at the evidential hearings, which is presented separately in the Background, Section B.

Demeter and the CW.

**March 21, 2014**: Lt. Demeter prepared a New Jersey State Operations Report indicating the "loss of issued cellular phone." The report indicated that the phone, later identified as the Casio, was lost on ***December 7, 2013***, and further indicates that "[l]ost with the cell phone were saved text messages that were stored on the phone for investigative purposes." He further indicated that he "reported the phone missing and was reissued a new cell phone shortly thereafter."

**April 4, 2014**: The Government produced the March 21, 2014 report to Defendants. *See* ECF No. 70. The Government's letter indicated that the lost Casio (with telephone number 973-881-0588) was "used to communicate with a confidential informant for a period of time during the charged conspiracy." *Id.* at 1. The Government further indicated that "[t]he records for the lost telephone have been requested and will be supplied as soon as the Government receives them." *Id.* at 1-2.

**July 28, 2014**: Defendant Vaughn filed a motion which addressed in part the "lost" Casio telephone. *See* ECF No. 82, at 19-20. He argued that if the Casio was lost, then communications stored in the phone also were lost. *Id.* at 19. He argued that the documents received from the Government indicate that "the confidential informant was in constant contact with agents of law enforcement, as well as [Lt. Demeter], in and throughout this investigation." *Id.* He, therefore, argued that he was entitled to the "stored communications." *Id.* at 20.

**January 5, 2015**: The Government informed Defendants that "[t]he telephone records of the lost cellular telephone recently have been supplied to the Government." *See* ECF. No. 124, at 1 (indicating that copies of the records were attached).

**February 12-14, 2015**: Lt. Demeter's Blackberry Bold encountered issues during an attempted data transition by the State Police of his Blackberry Bold to the Samsung Galaxy (an

Android phone).  Lt. Demeter notified the State Police technician on February 14, 2015 that he

had lost all of his contacts.  At some point thereafter, he realized that his text messages were also

lost.  His Samsung Galaxy was ultimately activated on February 27, 2015.[2]

**February 18, 2015 Hearing**:  The subject of the text message portion of this hearing was

solely related to the "lost" Casio, as neither the Court nor the Defendants were aware of the issue

with the Blackberry Bold at this time.  At this hearing, the Government represented:

> Some of the text messages between the informant and the State Trooper handler
> have been preserved.  Some of them we think were destroyed when the phone was
> lost because they were on the phone system and had not been photographed or
> preserved yet.[3]

*Id.* at 127:13-17 (emphasis added).  The Government also represented that "[t]here are some text

messages that have been preserved between the informant and FBI agents, and there are some

other text messages between the informant and other individuals that we preserved." *Id.* at 125:5-

8.

The Court made clear that the Government needed "to find out what happened to these text

messages, if any." *Id.* at 124:25-125:1.  The Court also inquired whether the phone that sent the

---

[2]  The Government has represented repeatedly that Lt. Demeter informed them of this issue with
the Blackberry Bold "immediately," and that they "talked to the tech agents," but the text messages
were "destroyed." *See* Hr'g Tr. (July 20, 2015) at 16:16-21, 18:5-15; *see also* Letter from Gov't
(June 25, 2015) at 2.

[3]  Based on the facts as we know them today, this representation does not seem accurate.  As of
the date of this hearing, the Government had __no__ text messages between Lt. Demeter and the CW
in its possession.  With respect to the Casio, it was at that time allegedly still lost, and the
Government had not preserved any messages prior to it being lost, so none were known to be
preserved at this point. *See, e.g., infra* at p.33 n.20.  With respect to the Samsung flip phone, the
Government was unaware of its existence, and has acknowledged that none of those messages
have been preserved. *See infra* at p.27.  With respect to the Blackberry Bold, the data had just
been lost, and the Government had no copies of the lost text messages (as none were preserved by
the Government prior to the loss and none were recovered until August 2015). *See, e.g., infra* at
p.33 n.20.   And finally, with respect to the Samsung Galaxy, Lt. Demeter had not yet activated
this phone. *See supra* at p.4.

messages (*i.e.* the other end of the messages from the phone that was "lost") still exists, and instructed the Government to explore that, stating that "[m]aybe the sent text messages weren't deleted . . . ." *Id.* at 126:21-127:5. The Court ordered the Government to report back in ten (10) days; the Government had requested seven. *Id.* at 127:18-19, 129:17-22; *see also* ECF No. 108 ¶ 11. The Government did not report back as instructed.

**April 23, 2015**: Lt. Demeter informed the Government via email that he "found the [Casio] phone, but there were only three text messages on their [sic] all basically irrelevant." He further stated that he "seem[ed] to recall there were more that are no longer saved on the phone. I would approximate 20 texts in the categories we spoke about." The three messages that were still on the Casio referenced by Lt. Demeter—all of which have been identified as being from October 2013 and all from the CW to Lt. Demeter—were:

- October 6, 3:58pm: "Yea, no way he'll know it was me."
- October 6, 6:59pm: "Can I use your name to [file] for a fire arm?"
- October 6, 8:05pm: "So I guess that's it? You manipulated me, used me put me and my families in jeopardy and now I'm in [sic] my own right?"

**May 7, 2015**: Lt. Demeter prepared a New Jersey State Police Special Report related to "loss of mobile phone data" for the Blackberry Bold. Lt. Demeter indicates in the report that, as a result of a technical error in transitioning data from the Blackberry Bold to the Samsung Galaxy, on or about ***February 14, 2015***, he "lost all information saved on my Blackberry, which included a number of text messages that were saved from confidential source." He estimated that "between 15-20 text messages were lost."

**May 11, 2015 Hearing**: Again, the subject of the text message portion of the hearing was solely related to the "lost" Casio phone, as neither the Court nor the Defendants were aware of the issue with the Blackberry Bold at this time. Despite knowing about the missing messages from another phone—the Blackberry Bold—for several months (*see infra* at pp.11, 13-14), and this

Court's prior order to find out the issues with the text messages, the Government had yet to inform the Court about the additional text message issue.

At the May 11 hearing, the Court first noted that the Government had failed to provide the information ordered by the Court at the February 18, 2015 hearing.  The Government responded that they "ha[d] been doing some investigation into the text messages . . . and it is just taking longer than we anticipated."  Hr'g Tr. (May 11, 2015) at 66:13-19.  The Court reiterated that, although that may be the case, the Government needed to update the Court and Defendants "so that we are not kept in the dark."  *Id.* at 66:21-24.

The Government then indicated that it now had the "lost" Casio.  *Id.* at 67:7-8.  The Government indicated that "[they] had asked the trooper to again look one more time in the car, and he found the phone."  *Id.* at 67:11-12.  With regard to the Government's efforts to identify and retrieve data related to messages on the Casio, the Government represented that they were "trying to determine how many text messages are still available on the phone, if there is a backup copy of any text messages in the state police department, [and] whether or not they have any of the text messages . . . ."[4]  *Id.* at 67:14-17.  The Government further asserted that they had "subpoenaed the phone company to attempt to look at the records to see how many actual text message phone calls came from the C.I. to the trooper in the relevant time period."  *Id.* at 68:14-17.  The Government indicated that there was an issue with Verizon, and they were "working with Verizon legal

---

[4] The Government acknowledged later in the hearing that the "state police do[] not have a policy in place right now for the preservation of text messages. . . . In fact, they don't preserve text messages."  *Id.* at 72:20-72:3.  Thus, it is unclear what preserved messages they were searching for: the Government knew there were only three messages on the phone (*see supra* at p.7); the Government knew the State had not preserved any; the Government knew they had not preserved any prior to the Casio being lost; and the Government had not attempted to recover data from the now-found Casio (*see infra* at p.27) (data recovery for the Casio was attempted for the first time on September 2, 2015, after instruction by the Court)).

department to see whether they are capable of sending us a report that shows whether or not the phone number that was called, whether it was a text message or a voice message."[5] *Id.* at 68:23-69:12.

In response to a question from the Court as to whether some of the messages were deleted, the Government responded: "Some of them would be lost due to the amount of volume of the text messages on the phone, or there may not be enough backup copies. It depends upon—you can't have just millions of text messages on your phone. Eventually it empties out." *Id.* at 69:21-70:2.

With regard to preservation, the Government acknowledged that "[t]his trooper [Lt. Demeter] was a member of the joint terrorist and task force and . . . knew of the FBI's requirement to preserve text messages." *Id.* at 73:4-7. The Government further represented that "[Lt. Demeter], as other members of the joint terrorist and task force are admonished to preserve *any* text messages on their cell phone between informants or agents . . . which he to the best of his ability did, based on the communications I've had with him." *Id.* at 70:19-25 (emphasis added). With respect to what Lt. Demeter specifically was requested to do to preserve his messages, the Government represented:

> [W]hat he was requested to do was when he could, if it was operationally safe to do it, to photocopy any text messages that he may have received on his phone with another phone. We had a number of different back up options available, and that was one of them, saying if you can't keep it on your phone and you're afraid there is going to be so many text messages that it will be lost, photocopy the phone and photocopy the text message.

*Id.* at 73:8-16. The Government asserted that "[Lt. Demeter] had preserved the text messages that

---

[5] The Verizon representative testified that, in response to the Government's April 2014 subpoena (the only one issued by the Government), Verizon provided the Government with records showing "subscriber information, ingoing, outgoing calls, as well as text messages." Hr'g Tr. (Sept. 1, 2014) at 169:12-17. For the "historical text message data," Verizon maintains "the originating [number], terminating [number], as well as the date and time the message was sent." *Id.* at 168:22-25.

he had received from the informant on the phone in the best way that he was capable of doing it, and then the phone was lost." *Id.* at 68:7-10.

The Court also asked for clarification from the Government about the investigation: "Was there a joint task force working, the federal and the state troopers working together on this issue at that point, or were there two different investigations?  What was going on?" *Id.* at 74:24-75:2. The Government responded:

> Your Honor, this investigation was out of the joint terrorist and task force at the FBI. On that task force, prior to this case beginning, that trooper was a member of that task force. He left the task force and went back to the state police. But in his capacity as a state police officer, he was involved in investigations occurring in and around Newark. He was aware of investigations that the joint terrorist and task force was working on, as he was working in Newark. When he got this informant, he brought this informant to the joint terrorist and task force. So there was only about a week to ten days with which . . . he became an informant for the FBI. So it is a very small window that he was not signed up with the FBI, but had been under state police.

*Id.* at 75:5-21.

Finally, the Court instructed the Government to get to the bottom of the text message issues and provide a detailed letter to the Court and the Defendants. *Id.* at 75:22.  The Court made clear:

> I would rather have one [letter] that you are going to stand by, rather than one and then say, you know, I misspoke or miswrote this, it's not the way it was, it was different. So let's get it clear, one shot. Let me know exactly what it is.

*Id.* at 74:16-21.

**June 25, 2015**:  The Government submitted a letter to this Court addressing the text message issue.  The Government acknowledged that on April 4, 2014, and January 5, 2015, they had sent letters to the Defendants inaccurately identifying Lt. Demeter's telephone number for the phones at issue (all of which were activated at different times on the same telephone number). With respect to the events surrounding the missing messages, the Government represented that:

- "The Trooper [Lt. Demeter] was aware of his obligation to preserve text

messages," and "[t]he Trooper did not delete *any* text messages with the CW in an attempt to save them on his phone" (emphasis added);

- Lt. Demeter "immediately reported" the loss of the Casio phone;

- Another trooper found the Casio phone approximately one and a half years after it was lost;

- Lt. Demeter "immediately notified the Government," and "turned over [the Casio] to the FBI in order to preserve the three text messages on the phone;

- Soon after losing the Casio, Lt. Demeter was issued a new phone on the same phone number;

- Lt. Demeter used the new phone [what was represented at subsequent hearings as the Blackberry Bold] "from December 2013 until February 2015";

- "The Trooper [Lt. Demeter] did not delete *any* text messages with the CW during that time" (emphasis added);

- "In February 2015, the NJSP transitioned from one telephone system to another," and "experienced technical difficulties while working on [the Blackberry Bold] and accidentally destroyed all the data contained therein to include the text messages saved from the CW";

- Lt. Demeter "immediately informed the Government" of the data loss related to the Blackberry Bold;

- "[A] limited number of text message conversations between him and the CW existed on [the Blackberry Bold]";

- "The lost text message conversations in this matter were short and related almost exclusively to scheduling issues"; and

- "The Government made all necessary and appropriate efforts to preserve text messages in this matter."

**June 30, 2015:**  Defendant Vaughn wrote a letter to the Court taking great issue with the representations expressed in the Government's June 25 letter, and requesting that a hearing on the matter be ordered to take place soon.  Plainly speaking, and leaving out the details in Defendant Vaughn's letter, Defendant Vaughn asserted that "[t]he Government's version of events here do

not add up."

**July 20, 2015 Hearing**:  Based on the Government's representation that there were only two sets of missing text messages at issue (not the three that were revealed pursuant to Court order on September 22, 2015), the Court inquired about the events surrounding the text messages on the Casio and Blackberry Bold to determine if there was a need for an evidential hearing on the matter. *See* Hr'g Tr. (July 20, 2015) at 13:10-11.[6]  The Court will break the Government's representations at this hearing into three categories: statements related specifically to the Casio, statements specifically related to the Blackberry Bold, and general statements applicable to all law enforcement text messages and the efforts to preserve them.

*Casio*.  The Government again represented that the loss of the Casio (which purportedly occurred on or about December 7, 2013) was immediately reported to the US Attorney's office as well as the State Police. *Id.* at 21:19-23.  The Government stated that "a few of the text messages that were on that phone were still on the phone when it was found." *Id.* at 23:11-13.  The following exchanged then occurred:

> COURT: A few or all?
>
> GOV'T: I don't know exactly the number of how many text messages were on that phone. Somewhere between three and ten, I believe, were on that phone, and the FBI has them.
>
> COURT: All of the messages that ha[d] been on that phone?
>
> GOV'T: That is my understanding, yes.

---

[6] While the Court is focusing on the Government's statements and the evidence submitted, versus Defendant Vaughn's argument, the Court notes that Defendant Vaughn responded by stating his disbelief in the Government's representation, asserting that he believed there were more than two sets of missing text messages.  *See* July 20 Hr'g Tr. at 13:15-19.

*Id.* at 23:14-21.[7]  The Court then inquired:

> COURT: [I]s there a report somewhere that sets forth the discovery of the phone, phone number one, the finding of the phone?
>
> GOV'T: . . . I believe there is a report about the [Casio] phone being found, yes, and being turned over to the trooper in question who then gave it to the FBI.
>
> COURT: Such a report exists?
>
> GOV'T: I believe, yes.
>
> COURT: Have you sent that to the defendant?
>
> GOV'T: I believe I have, your Honor. . . .

*Id.* at 38:2-14.  Because Defendant Vaughn represented that he had not received such a report, the Court ordered the Government to make sure that he had a copy, and to copy the Court on future correspondence. *See id.* at 38:18-39:6, 41:15-21.  In fact, as noted below (*see infra* at p. 17), Lt. Demeter's report on the finding of the Casio was prepared on *July 23, 2015*, three days *after* this hearing, and one day *after* this Court ordered an evidentiary hearing on the text message issue.

**Blackberry Bold**.  The Government reported that no text messages from this phone existed as of this date, stating that they were all destroyed by the technical difficulties.  Hr'g Tr. (July 20, 2015) at 16:15-19; *see also id.* at 24:5-13.  The Government again stated that it was informed of the data loss "immediately" after happening in February 2015.[8]  *Id.* at 18:5-15.  The Court inquired

---

[7] No Verizon records exist for the period from August 2012 to April 2013, so there is no way to know the quantity of messages between the CW and Lt. Demeter during that period. *Id.* at 24:17-25-25:2.  However, according to the Government's current representations, just for the period from April 2013 until August 2013, there appear to have been approximately 170 messages exchanged between the CW and Lt. Demeter.  Letter from Gov't to Court (Sept. 22, 2015) at 2.

[8] Defendant Vaughn argued that "[i]f these things happened in February of 2015 and reports were written from the trooper, the Government would have had knowledge of this at our previous hearings in May 2015 . . . [and they] mentioned nothing about any of this, nothing, not one iota." 40:18-24. He argued "that is even more of a reason why we need a hearing in this matter." *Id.* at 41:5-6.

if phone records were available related to the destroyed text messages. *Id.* at 24:14-15. The Government indicated that the telephone records that had been obtained only go back to April 2013. *Id.* at 24:17-24. The Government confirmed that prior to April 2013, they "have nothing." *Id.* at 24:25-25:2.

*General*. With regard to preservation, the Government acknowledged that ***all*** law enforcement working with the U.S. Attorney's Office "had a duty to preserve [the] text messages." *Id.* at 16:22-17:1. The Government further stated that "the troopers and agents have been admonished a number of times to keep those text messages and preserve them to the best of their ability." *Id.* at 17:1-3. The Court inquired specifically as to "[w]hat steps were taken by your office in order to ensure that took place." *Id.* at 17:6-7. The Government responded that the U.S. Attorney's Office had personally informed "the agents of their ***requirement*** to preserve ***any*** text messages that either they have with the CW or that the CW . . . has with the defendant or any other targets of the investigation." *Id.* at 17:8-12 (emphasis added).

The Court then asked the Government if they ever made a request of Lt. Demeter to turn over his text messages during the period when he lost his Casio to when the Blackberry Bold data was lost. *Id.* at 17:18-23. The following exchange with the Court took place:

> GOV'T: My request of the trooper was that he preserve them on his phone or make an effort to somehow have them downloaded and printed out.[9]
>
> Court: And he did neither?
>
> GOV'T: No, he did. He preserved them on his phone. They were on his phone.

Hr'g Tr. (July 20, 2015) at 17:24-18:4. The Court further clarified: "It was left in their [Lt.

---

[9] *See supra* at p.9 (Government represented that Lt. Demeter was instructed that if he was afraid the messages will be lost off his phone because of the volume, he should "photocopy the phone and photocopy the text message").

Demeter's] possession for two years with instructions just to preserve them, right?" *Id.* at 20:19-21. The Government responded, "Yes." *Id.* at 20:22. Despite their earlier statements regarding the duty of all law enforcement to preserve the messages, the Government now pivoted, further responding:

> [T]he Trooper [Lt. Demeter] followed all of the New Jersey State policies. He was completely in rights in what he did. He was instructed by our office to preserve them. He followed what the New Jersey State Police policy was and how to preserve those text messages.

*Id.* at 20:23-21:2; *see also id.* at 43:20-21 (same). As a result of the reliance on state policies, the Court ordered the Government to produce for *in camera* inspection the State Police protocol. *Id.* at 43:22-23. Despite having just argued that Lt. Demeter was following State protocol, the Government objected on relevance grounds. *Id.* at 44:14-16. The Court reiterated that the state policy should be produced. *Id.* at 44:20-45:3.

With respect to the Government's efforts to retrieve any lost text messages, Defendant Baron's counsel inquired about the CW's phone, stating "I understand they have been wiped off the trooper's phone, but there is a companion—I mean, the texts are going back and forth. Where is the CW's phone and where are those texts"? *Id.* at 45:16-20. The Government responded that "under the protocols in place at the time, and I believe they still are in place, the C.W.'s phones are not preserved. That's not the FBI's, the bureau's policy . . . ." 56:7-10. The following exchange occurred:

> COURT: Do you know for a fact that they were not preserved?
>
> GOV'T: As far as I know, they were not preserved, your Honor. Again, he is a civilian. He's not law enforcement. It's not like they are backed up to the FBI system, like Agent Weintraub's phone would be, so there was just not that capability in place at the time. But we obviously checked that.

*Id.* at 56:14-21. The Government noted that "Agent Weintraub just informed me, and this may

inform the discussion that we do have Mr. Vaughn's phone, which has plenty of communications with the C.W. so at least some of them are preserved." *Id.* at 60:8-11. Defendant Vaughn aptly responded that that did not inform the inquiry into the conversations between Lt. Demeter and the CW. *Id.* at 60:12-13.

From the beginning, Defendant Vaughn has argued that communications between the CW and Lt. Demeter and/or other law enforcement at the "inception" of the investigation is what is important for purposes of his entrapment defense. The Government, on the other hand, attempted to minimize the importance of any lost text messages from Lt. Demeter's phone, arguing that the FBI "has preserved any messages with the informant that he had with them [the FBI agents], and they also have preserved any text messages that Mr. Vaughn and the C.W. had." *Id.* at 29:12-15. The Government further argued:

> The inducement that we are talking about, we don't need to go to the text messages for that. We can go to the videotape. The video tape will show the interaction between the CW and Mr. Vaughn. The agent and the trooper—we are talking about approximately 30 text messages. 30 text messages. . . . So the notion that the entrapment took place in these 30 text messages is a joke, Your Honor. . . . And at trial, your Honor he can cross examine the CW . . . .

*Id.* at 52:16-53:11.[10] Defendant Vaughn responded:

> There is not one audio or video or DVD of the initial encounter . . . between me and the confidential informant. [Neither] the very first encounter nor a few subsequent encounters between [me and] the confidential informant are audio and video recorded.

*Id.* at 54:10-15. And as noted above, there are **_no_** preserved text messages between Lt. Demeter and the CW around the initial encounters;[11] there are not even text messages logs for that time

---

[10] *See infra* at p.23 n.14 (number of messages that were not preserved well exceeds thirty messages).

[11] *See infra* at p.18 (there are also no preserved message from the FBI prior to October 7, 2012).

period.  Therein lies the rub.  The Government's arguments related to text messages from later in the active phase or after the active investigation (or video from after the start of the investigation), thus, did not respond to the issues Defendant Vaughn raised.

The Court expressed that it was inclined to grant the evidentiary hearing.  The Court also ordered that the text messages that have been preserved between the FBI agents and the CW be produced for *in camera* inspection.  Hr'g Tr. (July 20, 2015) at 31:18-21, 32:5-10, 32:21-25.

Lastly, the Government argued that there was no need for a pretrial evidential hearing because "[a]t trial, the defendant will have an opportunity to explore with the C.W. anything that he wants to about those lost text messages." *Id.* at 33:25-34:6.   It is important to note that the Government has acknowledged that "if the trooper or the cooperator were to testify, those communications would relate to part of their testimony regarding the drug deals and it would become *Jencks* and potentially could have some *Giglio* information in there." *Id.* at 30:14-18.

**July 22, 2015**:  The Court ordered an evidentiary hearing on the text message issue for September 1, 2015, and required the Government to produce a Verizon representative, Lt. Demeter, and the State Police phone technician who handled Lt. Demeter's phone in connection with the deleting of the Blackberry Bold messages.  *See* ECF No. 139 at ¶ 8.

**July 23, 2015**:  Lt. Demeter prepared a New Jersey State Police Report on the "recovery of lost mobile phone."  The report states that "[o]n or about ***April 22, 2015***, Det. I. Scott Sanders . . . found a New Jersey State Police issued Casio GZ1 mobile phone that I lost in December, 2013" (emphasis added).

**August 10, 2015**: The Government produced for *in camera* inspection the text messages between the FBI agents and the CW as well as the messages that have been recovered from Lt. Demeter's phones.  The Government repeatedly has put in issue the quantity and substance of text

messages of the FBI (all of which were represented as preserved) as compared to Lt. Demeter. *See, e.g.*, Hr'g Tr. (Sept. 24, 2015) at 344:3-9 ("[T]he vast majority of [text messages] were with the FBI, because the FBI was the primary handling agency."). In particular, the Government (supported by Lt. Demeter's testimony) has argued that the "primary handler[s]" for the CW were Special Agent Kimberly Wojcik and Special Agent Andrew Garth Weintraub. *See, e.g.*, Hr'g Tr. (Sept. 1, 2015) at 124:12-16. Furthermore, the Government has specifically argued that, if anything should be inferred about the content of Lt. Demeter's missing messages, the "safest inference to make is to look at the FBI's text messages." Sept. 24 Hr'g Tr. at 367:2-6. Because of these arguments by the Government and Defendant Vaughn's argument that he has not been provided the FBI texts so he is unable to directly respond to their arguments (*see id.* at 368:3-10), the Court, however, notes the following:

- There are no preserved messages for the FBI Special Agents (Wojcik and Weintraub) during the period at the beginning of the investigation. The earliest FBI text message is October 7, 2012.

- On the other hand, Lt. Demeter testified that he communicated with the CW from the outset of the CW's involvement in the investigation. *See infra* at p.21.

- Agent Weintraub has 2 preserved text messages, both on April 6, 2014.

- Agent Wojcik has numerous text messages, the earliest of which is October 7, 2012. There are no text messages between August 8, 2013, and March 25, 2014.

- The Court has compared two periods: April 2013 (the earliest available for Lt. Demeter) and a period identified in the Government's September 22, 2015, letter (March 20, 2014, to March 26, 2014). In April of 2013, there are 9 messages between the CW and Agent Wojcik compared to approximately 80 between Lt. Demeter and the CW (as determined from the Verizon records). The Government represents that there are approximately 44 text messages between the CW and Lt. Demeter in the six days between March 20, 2014, and March 26, 2014. *See* Sept. 22 Letter at 2. There are 18 between Special Agent Wojcik and the CW during this period.

- A text from Special Agent Wojcik to the CW on April 15, 2014 reads: "I can't answer . . . Greg is in charge of the CIs for this case." ("Greg" presumably refers

to Lt. Gregory Demeter.)

- There is no message to the FBI agents from the CW accusing them of "manipulation" as compared to the text message on October 6, 2013, from the CW to Lt. Demeter. *See supra* at p.7.

- Finally, the FBI agents' text messages appear to have been preserved on FBI servers, not simply on the un-backed up phones of the agents.

**B.      Text Message Evidential Hearings: September 1 and September 24, 2015**

The testimony and documents produced in relation to the two evidential hearings identified many inconsistencies in the facts surrounding the missing text messages. The Court has not addressed every issue it has with the testimony and/or prior representations by the Government.

**September 1 Hearing**. As ordered, Lt. Demeter, the New Jersey State Police technician who dealt with Lt. Demeter's Blackberry Bold (Melissa Field), and a Verizon representative (Crystal Lonneberg) testified. Before turning to the witness testimony, the Government represented at this hearing that it had not produced the State Police preservation policy as previously ordered because no such policy existed during the relevant period. *See* Hr'g Tr. (Sept. 1, 2015) at 133:22-25.

***Lt. Demeter***. Shortly before Lt. Demeter testified, the Government was ordered to produce a February 5, 2013, New Jersey State Police Report of Lt. Demeter on the "Intelligence Section Electronic Communications Policy." In that report, Lt. Demeter notes the following:

- "I am writing regarding the Intelligence Section policy mandating the use of electronic communications, both emails and text messages, to notify the Bureau and Section prior to and at the conclusion of every controlled purchase."

- "Case law exists, both on the Federal and state level, clearly indicating that electronic communications of every type are discoverable. Law enforcement agencies turning over all forms of electronic communications will soon be the norm, not the exception." Report at 1.

- "[T]echnology has improved to the point where the content of text messages is retrievable and mobile communications companies are required to archive them

for up to one year." *Id.* at 1.

- "Several minor errors in the hands of a shrewd defense attorney can be made to look like a pattern of sloppy investigative techniques." *Id.* at 2.

- In requesting a meeting to discuss issues he has with the policy, Lt. Demeter "request[ed] that we invite an Assistant United States Attorney to this meeting, as the Federal law enforcement agencies already have concrete policies in place regarding the sending and archiving of electronic communications." *Id.* at 3.[12]

Immediately prior to Lt. Demeter's recent position with the State Police Street Gang North Unit (as of "approximately May of 2012," Sept. 1 Hr'g Tr. at 9:24-25), he was assigned to the "FBI Joint Terrorism Task Force or the JTTF in Newark" for three years, *id.* at 9:15-22. With respect to his role in the investigation of Defendants, Lt. Demeter testified as follows:

> Q: Are you familiar with what the time period of the investigation is?
> A: From August 2012 to August 2013.
> Q: And did you participate in the investigation of Lamont Vaughn and Jarez Baron and others?
> A: Yes.
> Q: What in general was your role in the investigation?
> A: At the outset, I had an informant that I brought over to the FBI and had him co-sign the informant, and then throughout the initial and through much of the investigation, I helped out with coordinating drug buys, surveillances, handling the informant and anything associated with the case.

*Id.* at 11:10-22. These statements do not seem accurate. The JTTF investigation against Defendant Vaughn was opened in early to mid-May 2012. Lt. Demeter was involved in the JTTF's opening of the case against Defendant Vaughn at that time.

With respect to the CW's recruitment, Lt. Demeter testified that he had been "cultivated" by the State Police. *Id.* at 12:4-13. Lt. Demeter clarified that "[i]t was the Street Gang North Unit that cultivated him," that he "had a piece in it," and that he supervised the other officers involved.

---

[12] This document was not used by Defendant Vaughn at the hearing so the Court does not rely on it in reaching its decision. However, it does corroborate the Court's conclusion with respect to Lt. Demeter's knowledge of text message preservation requirements and the federal government policies in particular.

*Id.* at 66:12-21.  He further confirmed that "before the confidential informant was made known to the FBI or to any agent at the FBI, [he] . . . already knew the guy or individual and had established a means of contacting that individual." *Id.* at 66:6-11.

Lt. Demeter testified that neither the Government nor the FBI instructed him to no longer contact the CW (or vice versa) after the CW was signed up with the FBI. *Id.* at 85:4-9; *see also* 86:15-21.  Instead, Lt. Demeter testified that part of his role in the investigation was to "help[] out . . . handling the informant," and that he "worked in direct contact" with the CW "throughout this particular investigation." *Id.* at 11:20-21, 67:1-4.  He clarified:

> [T]here was one portion of time near say June, July of 2013, I was reassigned. So my contact with the informant diminished. I am not sure to what extent, because I was reassigned, and I wasn't working this case until your arrest I was back on it. But for the most part, you are correct, I had direct contact with him throughout most of the case.

*Id.* at 67:18-25; *see also id.* at 68:1-11 (confirming text message contact with the CW from August 2012 to the date of Defendant Vaughn's arrest).  Lt. Demeter also testified that although he tried to keep his text messages to the CW to one or two words, sometimes the CW would "get a little wordy in some text messages." *Id.* at 19:2-12.

With respect to preservation policies, he testified that in his capacity on the JTTF for three years, he was aware "of the FBI's requirement to preserve text messages." *Id.* at 13:16-21.  He further testified that he was told by the U.S. Attorney's Office and the FBI that he "should be looking at these text messages" since the "outset of the investigation," but that in hindsight, he made an error and misunderstood "the policy and the case law." *Id.* at 24:23-25:21; *see also id.* 25:25-26:4.  With respect to instructions from the Government regarding how to preserve text messages with the CW, he testified that he did not recall a specific instruction from the FBI or Government to him to "photocopy the text messages that were sent or received between you and

the confidential informant with another telephone." *Id.* at 71:15-20; *see also id.* at 111:19-20. And he made clear that he did not photograph any. *Id.* at 74:23-24 ("Nothing I received or sent on my phone did I attempt to take a picture with another phone."); *see also id.* at 112:3-5 (same).

Lt. Demeter made clear that, before losing the Casio, he did not "forward over to the Government or to the FBI any of the text messages that [he] had on the telephone between [him] and the confidential informant." *Id.* at 81:2-6. Likewise with respect to the Blackberry Bold, in the fourteen months that he testified he had that phone before losing the data, he did not forward any text messages to the FBI or government. *Id.* at 114:12-25. He further testified that the Government never reached out to him to forward his text messages with the CW to them. *Id.* at 81:7-11; *see also id.* 81:24-82:1 ("At no time during the active part of the investigation was I specifically asked to transfer any text messages over [to the Government or FBI]."

With respect to the Government's involvement in reviewing his messages with the CW, he testified:

> COURT: So you were making the decision on your own at that point, right, whether it was exculpatory or discoverable?
>
> WITNESS: That's correct, your Honor.

*Id.* at 23:2-5. The Court further inquired whether the Government took part in making this decision, he stated that "[t]hey did not." *Id.* at 23:24-24:1. He again confirmed that they left the decision up to him. *Id.* at 24:2-3. He testified that, from August 2012 to December 2013, based on his decision-making as he reviewed the messages, he had preserved only 3, and that all of the 3 were subsequent to Defendant Vaughn's arrest. *Id.* at 29:4-10. He acknowledged that the records (which only go back to April 2013) show that there were more messages between him and the CW than the ones that he saved. *Id.* at 63:10-23. He agreed that 138 text messages between he and the

CW for the period from April 2013 to August 2013[13] "sounds approximately correct."[14]  *Id.* at 106:2-8.

Lt. Demeter testified that unsaved messages would automatically delete.  "So as more messages came in . . . because of the limited storage on that phone, they would eventually start to auto-delete." *Id.* at 23:9-14. He further testified that his phone often reached the maximum amount of messages capable of being stored, triggering the auto-delete function. *Id.* at 116:5-11; *see also id.* at 21:8-11.

With respect to efforts to retrieve the lost and/or deleted text messages, he testified that it was not until August 2015 that he brought the Blackberry to FBI's Regional Computer Forensic Computer Laboratories ("RCFL") after a suggestion from a State Police supervisor who "had worked at the FBI." *Id.* at 33:19-35:13.  He testified that the RCFL was able to retrieve approximately 12 messages between him and the CW. *Id.* at 118:2-6.  He acknowledged that he "would not think that was the entire text file for that time frame." *Id.* at 118:7-11.  He did not bring the Casio to the RCFL, and to his knowledge neither did the FBI. *Id.* at 35:21-36:8.

With respect to the CW's telephone, Lt. Demeter testified that, to the best of his knowledge, the telephone used by the CW was "not given to him by law enforcement." *Id.* at 83:16-21; *see also id.* at 84:6-8. He stated that he would expect it to have text messages saved on it. *Id.* at 84:14-17. He further testified that he never "attempt[ed] to have the confidential informant . . . forward the text messages between [him] and the confidential informant to either [him] or the FBI." *Id.* at 84:24-85:3. On the other hand, with respect to messages *on the CW phone* between the CW and

---

[13] Per his prior testimony, this period included several months of a diminished role.

[14] The Government's subsequent, September 22, 2015, letter to the Court indicates that this number was approximately 172 text messages, not 138.  One-hundred thirty-eight was the amount associated with only one of the phone numbers used by the CW.

Defendant Vaughn, Lt. Demeter testified:

> Q. Do you know whether or not any text messages were photographed on the informant's phone during this investigation?
>
> A. Yes. There were text messages photographed on the informant's phone.
>
> Q. Do you recall what text messages those were?
>
> A. I recall there were text messages between the informant and Mr. Vaughn that when the informant notified us, and I believe it was myself and Special Agent Wojcik in the car at the time said that he had them, that we took photographs of them to be able to preserve them.
>
> Q. Why did you take photographs of the communications between Mr. Vaughn, the defendant, and the C.W., why did you take photographs of those text messages?
>
> A. Because we believed that was relevant evidence for the case.

*Id.* at 125:16-126:6. When asked if he had been instructed to photocopy the messages on the CW's phone, he testified:

> I don't recall any specific instruction one way or the other. In the instance where we took the photographs, Special Agent Wojcik and myself were in the car, and I would say it probably was her that said we need to photocopy -- we need to take pictures of these text messages, so if you count that as instruction, that would be yes.

*Id.* at 130:11-21. Lt. Demeter admitted that they did not likewise photograph messages between the CW and law enforcement because, in his opinion, one group had evidential value, and the other did not. *Id.* at 130:22-131:17.

*Melissa Field.* Ms. Field is "a tech assistant for MIS for the [New Jersey] State Police." *Id.* at 138:13-18. Her testimony only related to the February 2015 attempts to transition Lt. Demeter from his Blackberry Bold to a Samsung Galaxy, and the difficulties that she experienced in the process. In particular, she noted that Lt. Demeter notified her on February 14, 2015, that he had lost the contacts on his phone. *Id.* at 161:15-17. She testified that she had "no idea why that would have happened," and that "it was unique to [her] that he would have lost everything." *Id.* at 161:18-

21, 163:12.

*Crystal Lonneberg*.  Ms. Lonneberg is "a senior analyst and a custodian of records for Verizon Wireless." *Id.* at 167:14-16. With respect to Verizon's retention policy regarding text messages, Ms. Lonneberg testified: "We keep and maintain Verizon Wireless text messaging information for one year.  The content, the actual messages themselves, are only kept three to five business days." *Id.* at 168:17-21.  With respect to the log of text messages that is kept one year, she explained that what was produced showed "the originating [number], terminating [number], as well as the date and time the message was sent." *Id.* at 168:22-25.

With respect to the subpoena issued by the Government on April 4, 2014,[15] Ms. Lonneberg testified that the Government had requested "subscriber information, ingoing and outgoing calls, along with text messaging information." *Id.* at 169:18-20, 171:5-8.  She testified that that information was first sent to the Government "in early April of 2014." *Id.* at 169:12-14.  She further testified that, given Verizon's one year retention policy, what was sent was "[a]nything that was available from April of 2013." *Id.* at 169:21-22.  She confirmed that from August 2012 to April of 2013, no text message information related to Lt. Demeter's text messages exist. *Id.* at 185:23-25.  She also confirmed that nothing else had been subpoenaed besides the information requested in the 2014 subpoena. *See id.* at 171:5-11.

Based on concern expressed by Defendant Vaughn regarding the activation dates of the various phones, the Court instructed Ms. Lonneberg that Verizon should produce information showing "the transactions that were made on the account with respect to activating and deactivating [the] three different telephones." *Id.* at 181:9-19.

---

[15] The Government represented at the hearing that they subpoenaed Verizon on April 4, 2014, when they "realized that there was an issue with the text messages." *Id.* at 185:5-14.

**September 22, 2015 Letter from the Government to the Court**.  In response to an order from the Court at the September 1, 2015, hearing to obtain the Verizon activation information related to Lt. Demeter's phone number, the Government identified the date ranges associated with the phone activated on Lt. Demeter's account for the period June 7, 2012, to present (*see supra* at p.4).  As noted above, for the first time, contrary to the representations and testimony to date, the Government indicated that there was a fourth phone at issue, a Samsung flip phone, which was activated after the Casio was lost.  Previously, the Government had represented and Lt. Demeter had testified that the Blackberry Bold was the phone activated after the lost Casio.  No information was provided about the whereabouts or text messages related to the newly identified Samsung flip phone.

The Government also indicated that the CW "used a total of four telephones to contact Lt. Demeter." Sept. 22 Letter at 2.  With respect to one of these phones, telephone number 201-993-1007, the Government indicated that the CW communicated with Lt. Demeter "via text . . . approximately 44 times over a six day period from March 20, 2014 to March 26, 2014." *Id.* Together with two other numbers, the Government stated that "[a]ll of these text communications occurred while Lt. Demeter was using the Casio . . . or the Samsung . . . flip phone." *Id.*  The Court notes that the CW also communicated with Lt. Demeter using 201-993-1007 after March 26, 2014, and while Lt. Demeter was using the Blackberry Bold.  Therefore, even the most recent information continues to be at least partially inaccurate and/or misleading.[16]

**September 24, 2015 Hearing**.  Lt. Demeter, Ms. Lonneberg, and two officers assigned to the RCFL testified.

---

[16] The Court also notes that, based on its review of the records, the documents as produced to Defendants related to the Blackberry Bold messages appear to be incomplete.

Ms. Lonneberg confirmed that Lt. Demeter had four phones—not three—during the relevant period. Hr'g Tr. (Sept. 24, 2015) at 215:7-10. Lt. Demeter testified that except for the newly produced Verizon records, he would not have known about the existence of the fourth phone (Samsung flip phone) that he used after the Casio was lost. *Id.* at 220:21-24. Although he did not remember the Samsung flip phone, Lt. Demeter testified that he did communicate with the CW on that phone because he knew he had communications with the CW, and "that would have been the only way [he] could have contacted him." *Id.* at 228:10-16. He also admitted that he did not recall saving any of them, or taking "any active steps to preserve any of [them]." *Id.* at 232:12-13, 242:13-16. In short, he testified that he did not remember the phone, but he was sure that none of the text messages during that period had evidential value. *Id.* at 234:11-235:2. The Government represented that they have been unable to locate this phone, and there is no argument that the messages had been preserved. *Id.* at 251:12-18, 254:15-20.

Lt. Demeter also testified that he brought the Blackberry Bold to RCFL on August 3, 2015, and that about 12 text messages between him and the CW were retrieved. *Id.* at 268:8-10; *see also id.* at 288:8-24 (confirming the date the data was retrieved and that some data was retrieved). Detective Edward Hughes ("Det. Hughes") testified that the FBI brought the Casio to the RCFL on September 2, 2015. *Id.* at 251:4-10. The RCFL was unable to retrieve any messages off of the Casio. *Id.* at 289:25-290:4.

Lieutenant Michael Tansey ("Lt. Tansey") testified that the RCFL recovery process can recover deleted files *so long as they have not already been deleted and overwritten. See id.* at 264:20-21, 266:1-9. Det. Hughes testified that there is "no way to know one way or the other" whether the recovered files were one that had "been deleted by the user" or whether they were "deleted by the activation." *Id.* at 302:18-23, 304:12-305:1.

At this hearing the Government confirmed that the "FBI preserved every single text message as innocuous as they were." *Id.* at 344:7-8.  And, the Government agreed that this is what they were supposed to do.  *Id.* at 344:9-13; *see also id. at* 337:5-6 (acknowledging the Government's "obligation to preserve text messages").  The Government acknowledged that text messages "absolutely have an impeachment value," *id.* at 307:3-7, and that there may be Jencks Act issues if they are not preserved, *see id.* at 310:9-11.  The Government further acknowledged that Lt. Demeter may not have "fully understood what Jencks material and *Giglio* material was . . . at the time." *Id.* at 353:20-22.

The Government argued that it had not acted in bad faith, but conceded that the Court could impose a remedy even if its actions did not rise to that level. *Id.* at 356:8-11.  Based on the facts as they presented them, the Government conceded that they should not be allowed "to use text messages between all of law enforcement, FBI and State Police, and the CW," *id.* at 358:15-19, but argued that it should be able to use other text messages in its case-in-chief, *id.* at 358:20-359:8.

Finally, the Government argued that if the Court was going to infer anything about the content of the missing text messages, it should look at FBI messages that were preserved. *Id.* at 367:2-14.  Defendant Vaughn first noted that the Government had not turned over those messages, but argued that, even sight unseen, this was an inappropriate comparison given the different relationship with Lt. Demeter and the fact that the CW had sent Lt. Demeter (and not the FBI to his knowledge) a text accusing him of manipulation. *Id.* at 368:3-25.

**October 13, 2015 Letter from the Government to the Court**.  After the September 24, 2015, evidentiary hearing in which Lt. Tansey testified had been completed, the Government produced documents related to prior police discipline for falsification of reports by Lt. Tansey. This is clearly impeachment material that should have been provided to Defendants at the time of

Lt. Tansey's testimony. As a result, the Court ordered that they be produced to Defendants in case Defendant Vaughn wanted Lt. Tansey recalled. It is troubling o the Court that the reports produced were not recent, and the Government provided no explanation for the late production beyond a "we were unaware" response.

## DISCUSSION

The Government has no "constitutional duty routinely to deliver [its] entire file to defense counsel." *United States v. Agurs*, 427 U.S. 97, 111 (1976). In contrast to the breadth of discovery permitted in civil cases, Rule 16 of the Federal Rules of Criminal Procedure "delineates the categories of information to which defendants are entitled in pretrial discovery in criminal cases, with some additional material being discoverable in accordance with statutory pronouncements and the due process clause of the Constitution." *United States. v. Ramos,* 27 F.3d 65, 68 (3d Cir. 1994). In general, this "additional material" is limited to material discoverable under the Jencks Act and under *Brady v. Maryland,* 373 U.S. 83 (1963). *Id.*

While the Government may not be required to produce its entire file, "Government disclosure of material exculpatory and impeachment evidence is part of the constitutional guarantee to a fair trial." United States Attorney Manual § 9-5.001 ("Policy Regarding Disclosure of Exculpatory and Impeachment Information"), subsection B ("Constitutional obligation to ensure a fair trial and disclose material exculpatory and impeachment evidence") (citing *Brady*, 373 U.S. at 87; *Giglio v. United State*s, 405 U.S. 150, 154 (1972)). To that end, "[i]t is the obligation of federal prosecutors, in preparing for trial, to *seek* all exculpatory and impeachment information from all the members of the prosecution team." *Id.* § 9-5.001(B)(2) ("The Prosecution Team") (emphasis added); *see also United States v. Reyeros*, 537 F.3d 270, 281 (3d Cir. 2008) ("It is well-settled that the prosecution has a duty *to learn of* and disclose information 'known to the

others acting on the government's behalf in the case.'" (emphasis added) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995))).[17]   In other words, federal prosecutors do not discharge their duty simply by hoping prosecution team members understand their duties, preserve the required information, and then self-identify discoverable items.

Here, the Government has conceded that there was a duty to preserve the text messages, and that they did not preserve all of the text messages between Lt. Demeter and the CW.[18]   The Government also has conceded that some sanction is appropriate.   The question is simply the nature of the remedy.

Defendant Vaughn argues that the Government's actions have violated his due process rights, and, as such, the appropriate remedy is dismissal of the indictment.   *See, e.g.*, Hr'g Tr. (Sept. 24, 2015) at 334:7-9.   "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."   *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *see also United States v. Deaner*, 1 F.3d 192, 200 (3d Cir. 1993) ("A defendant who claims destroyed evidence might have proved exculpatory if it could have been subjected to tests has to show the prosecution's bad faith in ordering or *permitting* its destruction." (emphasis added)).   "While a showing that the government did not follow standard procedure could provide some evidence of bad faith," the Third Circuit has "not held that an improper procedure in and of itself implies bad faith."   *Deaner*, 1 F.3d at 200.

---

[17] "Members of the prosecution team include federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant."   United States Attorney Manual § 9-5.001(B)(2) (citing *Kyles*, 514 U.S. at 437).   Under the Third Circuit's case-by-case analysis, Lt. Demeter is part of the prosecution team. *See Reyeros*, 537 F.3d at 282.

[18] The Government also acknowledged that if Lt. Demeter or the CW were to testify, text messages "would become Jencks and potentially could have some *Giglio* information in there."   Hr'g Tr. (July 20, 2015) at 30:14-18.

The Government concedes that this Court also has the power to impose sanctions for governmental discovery infractions even if bad faith is not shown. *See* Hr'g Tr. (Sept. 1, 2015) at 356:8-11.

On the record presently before the Court, the Court does not find that dismissal of the indictment is an appropriate remedy. However, the Court finds that stronger sanctions than those proposed by the Government are warranted. The Court reaches this decision for five primary reasons.

*First*, the Court finds that Lt. Demeter was aware (or reasonably should have been aware) of the FBI policy regarding the preservation of all text messages between law enforcement and confidential witnesses. Therefore, as a member of the federal prosecution team, that is the appropriate policy against which his actions should be judged. In addition, the Court finds that, contrary to this policy, Lt. Demeter (for whatever reason, nefarious or not) systematically deleted or knowingly permitted text messages with the CW to be deleted as a result of the auto-deleting functionality. The Court also finds Lt. Demeter's repeated mantra that he knows there was no evidential value in the missing messages lacks credibility. Aside from other reasons, the Government acknowledged that Lt. Demeter "may not have fully understood" what "Jenks material and *Giglio* material was" when he was reviewing the text messages. *See* Hr'g Tr. (Sept. 24, 2015) at 353:20-23. It also is unpersuasive for Lt. Demeter to self-servingly testify with absolute certainty that there was nothing of evidentiary value in the deleted messages when he simultaneously provided inaccurate testimony on very basic matters including,[19] but not limited to, the identity of the phone he received after the Casio was lost.

*Second*, the Court is not persuaded by the Government's attempts to minimize both Lt.

---

[19] The Court also notes that none of the State Police Reports of Lt. Demeter that have been produced were prepared contemporaneously with the events reported on. In fact, they were all prepared either shortly before or after a filing by the Government or a hearing with this Court.

Demeter's role in the investigation and handling of the CW, as well as the quantity and substantive content of his text messages with the CW. The evidence before the Court overwhelming supports that Lt. Demeter played more than a limited role in the investigation, and in fact played an active role in this investigation from start to finish. Also, despite the Government's repeated assertions that the FBI agents were the main handlers of the CW, Special Agent Wojcik's text message ("Greg is in charge of the CIs for this case") indicates otherwise. Additionally, the Court has seen no evidence of text messages from either agent prior to October 2012, whereas Lt. Demeter testified that he had been in contact via text message with the CW from the beginning. Based on the evidence and testimony before the Court, not only is the quantity of messages that were actually sent and received between Lt. Demeter and the CW (from the Verizon text logs that are available) not negligible, the evidence supports that Lt. Demeter may have had a different relationship with the CW. He (with other State Police) "cultivated" the witness, he was in contact with him throughout not only the active part of the investigation but also after that period, and he was the one the CW reached out to for help and also accused of manipulation.

*Third*, the cumulative effect of the inconsistencies in the Government's representations, the documents, and Lt. Demeter's testimony is such that the Court finds the Government's professions of simple misunderstanding or inadvertent error not credible. The length of time that the Government took to get basic information—absent a Court order—bolsters this view. One extraordinary story (or misstatement) may be explained away through simple accident or inadvertence, two makes plausibility more challenging, and three claims of simple inadvertence are simply not believable. It makes no difference to the Court at this point whether Lt. Demeter misled the Government, or whether the Government did not instruct him regarding the preservation policies as represented on numerous occasions to this Court. The facts are such that, either way,

the outcome is the same.  There has been no hearing or letter in the past nine months were there has not been some change in statements previously made, some new surprise, or some undisclosed or misstated fact, right up to and including the identification of yet another phone (whose whereabouts are unknown) in the midst of the evidentiary hearings.

*Fourth*, contrary to the Government's statement that they "made all necessary and appropriate efforts to preserve text messages in this matter," the facts indicate otherwise, and, therefore, the Court disagrees.  It is undisputed that the Government never requested that Lt. Demeter produce any text messages for review or safeguarding during the active phase of the investigation or for at least some time thereafter.[20]  Additionally, when Lt. Demeter lost the Casio, even though the Government has repeatedly asserted that they were "immediately" notified of the loss, the Government did not subpoena the Verizon records until April 4, 2014.  Because of Verizon's one-year retention policy, this delay resulted in four months less of text message logs during the active part of the investigation than had the request been made immediately.[21]

More importantly, even ***after*** Lt. Demeter "lost" the Casio in December 2013, the Government did not require Lt. Demeter to safeguard the text messages by periodically producing them to the FBI.[22]  Even if it was believable that the Government thought that saving messages on

---

[20] Lt. Demeter testified: "At no time during the active part of the investigation was I specifically asked to transfer any text messages over [to the Government or FBI]." Hr'g Tr. (Sept. 1, 2015) at 81:24-82:1.  The Government represented to the Court at the July 20, 2015, hearing that the messages on the Blackberry Bold were left in Lt. Demeter's possession. *See supra* at pp.14-15.

[21] Because the Government first requested the text message records from Verizon in April 2014, the records only go back to April 2013, as Verizon only retains such data for one year.  Therefore, there is no way to know the volume of messages during the first half of the active investigation.

[22] The Government acknowledged that they left the Blackberry Bold messages in Lt. Demeter's "possession for two years with instructions just to preserve them." Hr'g Tr. (July 20, 2015) at 20:19-22.

an auto-deleting phone was safe to begin with,[23] they had no reason to believe saving messages only on Lt. Demeter's phone without backup was appropriate after the Casio was lost. The Government was not even aware of the different phones at issue until the records were produced this September—upon Defendant Vaughn's repeated requests and this Court's order. Despite all of the controversy with Lt. Demeter's phones, the Government never requested the activation information from Verizon.

It is also undisputed that when the Government was informed of the lost data on the Blackberry Bold, they simply accepted that the messages were "destroyed," and made no effort to retrieve the messages. It was Lt. Demeter who ended up bringing the phone to RCFL, in August 2015, five months after all the data was purportedly destroyed, and after an evidentiary hearing had been ordered. And, it was then that RCFL was able to retrieve some of the messages. The Government also never attempted to retrieve messages from the Casio. Whether or not the messages were ultimately able to be retrieved, it is notable that the Government made no efforts to do so. However, in contrast, it appears that the Government did in fact make every effort to retrieve the messages from Defendants' seized phones.

As a result of the Government's lack of effort to ensure that Lt. Demeter's text messages were preserved from the outset, very few messages were in fact "preserved" as the Government has repeatedly stated. *See, e.g.*, Sept. 24 Hr'g Tr. at 252:20-25. A few were actually saved by Lt. Demeter, a few others were recovered by RCFL, and most (according to the Verizon records and Lt. Demeter's testimony) were not preserved by Lt. Demeter, the Government, or at the Government's request. Furthermore, ***none*** were preserved or now exist during the active period

---

[23] *See* Hr'g Tr. (May 11, 2015) at 69:21-70:2 (In responding to a question about whether some messages on the Casio were deleted, the Government responded: "It depends upon—you can't have just millions of text messages on your phone. Eventually it empties out.").

of the investigation. And in fact, the Government admits it has "nothing," not even the text logs, from the period beginning August 2012 to April 2013. This issue has nothing to do with the alleged loss of the Casio, the loss of data on the Blackberry Bold, or the unknown whereabouts of the Samsung flip phone. The data was not properly preserved prior to the losses, which is why that data was not all there (or even mostly there) when the Casio was found, or some data from the Blackberry Bold was recovered.

*Fifth*, and most notably for purposes of the remedy imposed by the Court, is the Government's differential treatment of text messages depending on the source and use of those messages. Upon reflection with regard to the appropriate remedy, the Court found the events surrounding the CW's phone most illuminating. It is the place where the Government's differential treatment is most noticeable. It is undisputed that the FBI and Lt. Demeter were in control and possession of the CW's phone at least at some point. While in possession of the CW's phone, they photographed messages between the CW and Defendant Vaughn, but failed to photograph any other investigation-related texts on the CW's phone. There also is no evidence that, after the issue with Lt. Demeter's phone arose, the Government attempted to obtain any other saved messages on the CW's phone(s).

As the Supreme Court stated long ago,

> [t]he United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.

*Berger v. United States*, 295 U.S. 78, 88 (1935); *see also United States v. Morena*, 547 F.3d 191, 193 (3d Cir. 2008) (quoting *Berger*). Whether for nefarious reasons or not, the Government applied a different level of diligence with respect to different text messages. With respect to Lt. Demeter's messages with the CW, they exercised none. On the other end of the spectrum, the

Government presumably used all resources available to recover and safely preserve messages from Defendants' phones. And with the phone in the middle—the CW's phone—the FBI and Lt. Demeter sat in a car and photographed one set of messages to ensure preservation, and not the others.

Therefore, together with the others reasons identified above, the Court finds the appropriate remedy is precluding the Government from using *any* text messages in its case-in-chief.[24] Precluding only the text messages between law enforcement and the CW (the category with the least interest to the prosecution), as the Government proposes, provides an inadequate remedy to Defendant Vaughn and provides an inadequate incentive for the Government to exercise appropriate diligence in the future, both in complying with preservation polices[25] and in making representations to this Court and following its orders.

Defendant Vaughn had alternatively requested that the Court give an adverse inference instruction to the jury regarding the missing text messages. The Government has requested that the Court reserve on that decision. The Court agrees with the Government on this point and will reserve until trial as to whether it will, in addition to the sanction set forth herein, also give an

---

[24] The Court reserves on whether the messages can be used for other purposes to be decided on a issue-by-issue basis during trial.

[25] The Court was disturbed by the repeated statements that it was typical for a law enforcement officer to be the sole, on-the-spot arbiter during an investigation of what is evidence with respect to communications with a potential witness, prior even to charges being filed. This is contrary to having a policy requiring the preservation of all communications with potential witnesses. Such a policy serves at least three purposes, all of which are negated if officers are saving or deleting messages with possible witnesses based only on their opinions: (1) as the Government acknowledged, there is likely to at least be Jencks violations if the witness or agent testifies (which cannot be determined with certainty at that point); (2) even a trained attorney cannot determine exactly what will be relevant or material evidence during the investigation before the charges and defenses are known; and (3) it deprives the judicial system of its role in reviewing evidence to determine if in fact the officers' and U.S. Attorneys' opinions comply with the law.

adverse inference instruction. The Court will make that determination at the conclusion of the presentation of evidence, or at any other point during the trial as the Court deems appropriate.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendant Vaughn's motion. An appropriate Order accompanies this Opinion.

DATED: November 10, 2015

JOSE L. LINARES
U.S. DISTRICT JUDGE